UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TODD C. BANK,<br><br>                              *Plaintiff*,<br><br>            -against-<br><br>NFL PROPERTIES LLC,<br><br>                              *Defendant*. | **COMPLAINT**<br><br>1:24-cv-8814 |

## PARTIES

1.      Plaintiff, Todd C. Bank ("Bank"), is a natural person who resides in the State of New York.

2.      Defendant, NFL Properties LLC ("NFLP"), is a limited-liability company organized and existing under the laws of the State of Delaware, and has its principal place of business in New York, New York.

## JURISDICTION AND VENUE

3.      This Court has subject-matter jurisdiction under 28 U.S.C. Section 1331.

4.      This Court has personal jurisdiction over NFLP under Section 301 of the New York Civil Practice Law and Rules.

5.      Venue is proper in this District under 28 U.S.C. Section 1391(b)(1).

## ALLEGATIONS

### I. National Football League

6.      The National Football League ("NFL") is an unincorporated association of 32 U.S.-based professional football teams ("NFL Teams") that provide entertainment services to the public in the form of football games.

1

**II. NFL Trademarks**

7.    The NFL and the NFL Teams have adopted, and used, and will continue to use, in commerce throughout the United States, certain names, logos, symbols, and other identifying marks and indicia relating to the NFL Teams and the NFL itself ("NFL Trademarks").

**III. NFL-Related Merchandise**

8.    Millions of people have purchased, and will continue to purchase, a variety of merchandise, including, but not limited to, apparel, caps, jewelry, toys, furniture, pennants, and bags, because such people view that merchandise as pertaining to an NFL Team, the NFL itself, or each (such people will hereinafter be referred to as "NFL Fans," and such merchandise will hereinafter be referred to as "NFL-Related Merchandise").

9.    NFL Fans purchase NFL-Related Merchandise for the primary purpose of one or each of the following: (i) identifying with their favorite NFL Team, or another NFL Team, in such team's capacity as a football team ("Team Capacity"), as opposed to its capacity as a trademark holder; and (ii) identifying with the NFL in the NFL's capacity as a football league ("League Capacity"), as opposed to its capacity as a trademark holder (these two purposes will hereinafter be collectively referred to as the "Primary Purposes").

10.    The overwhelming majority of the merchandise that NFL Fans purchase in order to achieve one, or each, of the Primary Purposes bears at least one NFL Trademark ("NFL-Trademark-Bearing Merchandise").

11.    The inclusion of NFL Trademarks on NFL-Trademark-Bearing Merchandise is dictated by one, or each, of the Primary Purposes.

12.    In order for merchandise to serve the respective Primary Purposes, it must look like it refers to an NFL Team in its Team Capacity, the NFL in its League Capacity, or each (the "Aesthetic Requirements").

13.     The NFL Trademarks on NFL-Trademark-Bearing Merchandise satisfy whichever of the Aesthetic Requirements relate to the purchased merchandise.

14.     The NFL, acting through NFLP, licenses, in exchange for fees, the manufacturing of NFL-Trademark-Bearing Merchandise (such licensed merchandise will hereinafter be referred to as "NFL-Licensed Merchandise").

15.     To the vast majority of those purchasers of NFL-Licensed Merchandise who know or care that the NFL has licensed it, the fact of such licensing is either unimportant or far less important than whichever of the Primary Purposes relate to the purchased merchandise.

**IV. Bank's Wish to Sell NFL-Related Merchandise**

16.     Bank wishes to, and if granted the relief sought in the Prayer for Relief herein would forthwith, create an e-commerce store ("Bank's Store") selling NFL-Trademark-Bearing Merchandise that would enable NFL Fans to achieve one, or each, of the Primary Purposes ("Bank's NFL Merchandise").

17.     Bank's NFL Merchandise would not be NFL-Licensed Merchandise.

**V. Competitive Disadvantage**

18.     Merchandise that is not NFL-Trademark-Bearing Merchandise is far less desirable to NFL Fans seeking to purchase merchandise that achieves one, or each, of the Primary Purposes.

19.     Bank, if unable to sell Bank's NFL Merchandise, would be at a significant disadvantage in the market of NFL Fans because Bank would be unable to be reasonably competitive in selling merchandise to NFL Fans that achieves one, or each, of the Primary Purposes.

**VI. The Parties' Dispute**

20.     On November 1, 2024, Bank sent a letter to the NFL that stated Bank's view that sales of Bank's NFL Merchandise would not constitute trademark infringement or dilution under the Lanham Act, 15 U.S.C. §§ 1051 - 1141 (a copy of Bank's letter is attached as Exhibit "A" hereto).

21.    On November 18, 2024, Bank received a letter from NFLP that stated its view that sales of Bank's NFL Merchandise would constitute trademark infringement and dilution, and expressly reserved the NFLP's rights to sue Bank for trademark infringement and dilution in the event that Bank were to sell Bank's NFL Merchandise (a copy of NFLP's letter is attached as Exhibit "B" hereto).

22.    If Bank were to operate Bank's Store without having been granted the relief sought in the Prayer for Relief herein, NFLP would most likely: (i) learn of such operation as a result of NFLP's membership of the Coalition to Advance the Protection of Sports Logos ("CAPS"), in collaboration with which NFLP has established a program for discovering e-commerce stores that sell NFL-Trademark-Bearing Merchandise that is not NFL-Licensed Merchandise; and (ii) thereupon bring legal action against Bank.

**VII. Bank's Wish to Avoid, or Limit, the Risk of Being Subjected to Legal Action**

23.    Bank wishes to sell Bank's NFL Merchandise while avoiding, or limiting, the risk of being subjected to legal action.

## LEGAL ASSERTIONS

24.    Bank's selling of Bank's NFL Merchandise would not constitute any of the following: (i) with respect to that merchandise's inclusion of NFL Trademarks that are registered with the United States Patent and Trademark Office ("USPTO"), (A) trademark infringement under Section 32(1)(a) of the Lanham Act, codified at 15 U.S.C. § 1114(1)(a), and (B) trademark counterfeiting under Section 32(1)(b), 15 U.S.C. § 1114(1)(b); and (ii) with respect to that merchandise's inclusion of NFL Trademarks regardless of whether those trademarks are registered with the USPTO, (A) false designation of origin under Section 43(a)(1)(A), 15 U.S.C. § 1125(a)(1)(A), and (B) trademark dilution by blurring or by tarnishment under Section 43(c), 15 U.S.C. § 1125(c).

## PRAYER FOR RELIEF

Plaintiff requests the following:

(a)    Pursuant to 28 U.S.C. Section 2201(a), a Judgment declaring that Bank's selling of Bank's NFL Merchandise would not violate any of the following: (i) 15 U.S.C. Section 1114(1)(a); (ii) 15 U.S.C. Section 1114(1)(b); (iii) 15 U.S.C. Section 1125(a)(1)(A); and (iv) 15 U.S.C. Section 1125(c); and

(b)    Pursuant to 28 U.S.C. Section 2202, further necessary or proper relief, after reasonable notice and hearing, based upon all, or any part of, the Judgment described in the preceding paragraph.

Dated: November 19, 2024

Respectfully submitted,

    s/ *Todd C. Bank*
TODD C. BANK,
  ATTORNEY AT LAW, P.C.
119-40 Union Turnpike
Fourth Floor
Kew Gardens, New York  11415
(718) 520-7125

By Todd C. Bank

*Counsel to Plaintiff*

# EXHIBIT "A"

## Letter from Todd C. Bank to National Football League

## November 1, 2024

TODD C. BANK, ATTORNEY AT LAW, P.C.
**119-40 Union Turnpike, Fourth Floor**
**Kew Gardens, New York 11415**
**Telephone (718) 520-7125**
**Facsimile (856) 997-9193**

www.toddbanklaw.com                                          tbank@toddbanklaw.com

November 1, 2024

National Football League
345 Park Avenue
Fifth Floor
New York, New York 10154
Attn.: Jeffrey Pash

**Via Federal Express**

**Re: John Doe**

Dear Mr. Pash:

     I represent a client to whom I will refer as John Doe. Mr. Doe wishes to sell unlicensed NFL merchandise, but, as he is aware that the NFL, acting through NFL Properties LLC ("NFLP"), seeks to prevent such sales, he would like to enter into an agreement with NFLP that would assure him of freedom from litigation.

     By "NFL merchandise," I mean: (i) merchandise with an NFL team's color patterns and overall design except for an NFL, or NFL team's, logo or insignia, *i.e.*, a trademark in the form of a trade dress (*see Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140, 145 (2023) ("[t]he Lanham Act [(15 U.S.C. §§ 1051 - 1141)], the core federal trademark statute, defines a *trademark* . . . . [in] [15 U.S.C.] § 1127. The first part of that definition, identifying the kind of things covered, is broad: It *encompasses* words . . ., graphic designs . . ., and so-called *trade dress*, the overall appearance of a product and its packaging" (emphases added))); and (ii) merchandise, whether or not including such trade dress, that contains a trademark in the form of an NFL, or NFL team's, logo or insignia, *i.e.*, a 'customary' trademark.

     I will use the term "trademarks" (or "marks") to refer to both customary trademarks and trade dress unless indicated otherwise, and will use the term "NFL Trademarks" (or "NFL Marks" or "Marks") to refer to customary NFL and NFL-team trademarks and NFL and NFL-team trade dresses unless indicated otherwise. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 773 (1992) ("the protection of [customary] trademarks and trade dress under [15 U.S.C. § 1125(a)] serves the same statutory purpose of preventing deception and unfair competition."); *Christian Louboutin S.A. v. Yves Saint Laurent America Holdings, Inc.*, 696 F.3d 206, 216 (2d Cir. 2012) ("the same analysis used in claims of trade[-]dress infringement applies to claims of trademark infringement under [15 U.S.C. § 1114]" (cleaned up)); *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d

Jeffrey Pash                                                                                    re: John Doe
November 1, 2024
–page 2–

298, 308, n.2 (6th Cir. 2001) ("[t]rade[-]dress issues follow the same rules and laws as [customary-]trademark issues."); *D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 111 F.4th 125, 133 (1st Cir. 2024) ("'[t]rade dress is registrable as a trademark if it serves the same source-identifying function as a [customary] trademark,'" quoting *In re Forney Indus., Inc.*, 955 F.3d 940, 945 (Fed. Cir. 2020)); *adidas America, Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 755 (9th Cir. 2018) ("[l]ikelihood of confusion in the trade[-]dress context is evaluated by reference to the same factors used in the ordinary trademark context" (citation and quotation marks omitted)); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1147, n.12 (10th Cir. 2016) ("'[t]rade dress ... serves the same function as trademark, and is treated the same way by the Lanham Act and the cases interpreting it,'" quoting *Publications Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 338 (7th Cir. 1998)); *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235, n.8 (5th Cir. 2010) ("[t]he same tests apply to both trademarks and trade dress to determine whether they are protectible and whether they have been infringed, regardless of whether they are registered or unregistered," citing *Two Pesos*, 505 U.S. at 768-770 (additional citation and quotation marks omitted)).

Mr. Doe's sale of unlicensed NFL merchandise would not constitute either trademark infringement or dilution. That is because NFL Trademarks in the merchandise context are 'functional' within the meaning of trademark law, and, "aspects of a product that are 'functional' generally 'cannot serve as a trademark,'" *Christian Louboutin*, 696 F.3d at 218, quoting *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 165 (1995); *see also Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003) ("in construing the Lanham Act, we have been 'careful to caution against misuse or over-extension' of trademark and related protections into areas traditionally occupied by patent or copyright," quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001)).

With respect to infringement specifically: "[e]ven after a mark is registered, it is a defense to infringement '[t]hat the mark is *functional*.' [15 U.S.C.] § 1115(b)(8)[.] . . . Thus, even if copying would confuse consumers about a product's source, competitors may copy unpatented *functional* designs," *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l America Corp.*, 986 F.3d 250, 256 (3d Cir. 2021) (emphases added); *see also Christian Louboutin*, 696 F.3d at 217 ("if a markholder has successfully demonstrated that its mark is valid and that the competitor's mark is likely to cause confusion, the competitor can nevertheless prevail ... by showing that the [competitor's] mark is *functional*—a traditional defense to the enforcement of a trademark" (emphasis added; citation and quotation marks omitted; cleaned up)).

With respect to dilution, *see Groeneveld Transport Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 519 (6th Cir. 2013) ("[the defendant's] [product] design . . . is [not] *nonfunctional* . . .[,] which [is a] *requirement[] of a dilution claim* under [15 U.S.C. § 1125(c)]" (emphases added)); *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27 (1st Cir. 1998) (explaining, with respect to "trademark infringement and dilution," *id.* at 37, that: "[f]unctionality, or, more precisely, . . . non-functionality . . ., is an essential component of the protection the law gives to trademarks and trade dress. . . . [N]on-functionality is essential because the doctrine [of functionality] prevents trademarks from limiting legitimate competition," *id.* at 38); 15 U.S.C. § 1125(c)(4) (placing burden on

Jeffrey Pash                                                                re: John Doe
November 1, 2024
–page 3–

markholder of an unregistered trade dress to show, in support of a dilution claim, that the trade dress is "not functional and is famous").

Trademark dilution differs from trademark infringement in two respects: first, the mark at issue must be "famous," 15 U.S.C. § 1125(c)(1), and, second, a likelihood of confusion is not required. *See id.* Regarding the fame requirement, "a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of *source* of the *goods or services of the mark's owner*," 15 U.S.C. § 1125(c)(2)(A) (emphases added); *see also Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 167 (4th Cir. 2012) ("dilution theory provides that 'if customers or prospective customers *see the plaintiff's famous mark used by other persons* in a non-confusing way to *identify other sources* for many different goods and services, then the ability of the famous mark to clearly identify and distinguish *only one source* might be "diluted" or weakened,'" quoting Thomas McCarthy, 4 *McCarthy on Trademarks and Unfair Competition*, § 24:67 (4th ed.) (emphases added)).

In order for a markholder to be a 'source' of goods, *i.e.*, a 'source' of a product, he must *manufacture* a product that bears his trademark, or *authorize a third party to do so* such as through a license or other type of sponsorship. *See Jack Daniel's*, *supra*, 599 U.S. at 156-157 ("[f]rom its definition of 'trademark' onward, the Lanham Act views marks as *source identifiers*—as things that function to 'indicate the *source*' of goods, and so to 'distinguish' them from ones '*manufactured or sold by others*,'" quoting 15 U.S.C. § 1127 (emphases added)); *Qualitex*, *supra*, 514 U.S. at 163-164 ("[i]n principle, trademark law, by preventing others from copying a *source-identifying mark*, . . . quickly and easily assures a potential customer that *this* [(emphasis in original)] item—the item with this mark—is *made by the same producer* as other similarly marked items" (emphases added)); *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205 (2000):

> Although [a product's] words and packaging can serve subsidiary functions—a suggestive word mark (such as "Tide" for laundry detergent), for instance, may invoke positive connotations in the consumer's mind, and a garish form of packaging (such as Tide's squat, brightly decorated plastic bottles for its liquid laundry detergent) may attract an otherwise indifferent consumer's attention on a crowded store shelf—their *predominant function* remains *source identification*. Consumers are therefore predisposed to regard those symbols as *indication of the producer*, which is why such symbols almost automatically *tell a customer that they refer to a brand, and immediately signal a brand or a product source*.

*Id.* at 212-213 (emphases added; citations and quotation marks omitted; cleaned up).

Regarding the type of source that the NFL is with respect to the merchandise that it licenses, *i.e.*, a 'secondary source,' the Federal Circuit Court of Appeals explained:

Jeffrey Pash                                                                      re: John Doe
November 1, 2024
–page 4–

> At one time it was accepted law that a trademark's *sole purpose* was to identify for consumers the product's *physical source or origin*. Under this early 'source theory' of protection, trademark licensing was viewed as philosophically impossible. However, in the middle of the twentieth century, a trend develop[ed] *approving of trademark licensing*—so long as the licensor controlled the quality of the licensee's products—on the theory that a trademark might also serve the function of identifying product quality for consumers. The quality theory *permits a trademark owner to license the mark* and allow licensees to buy supplies from anyone, provided the licensor maintains quality control over products reaching consumers under the mark.

*Authentic Apparel Group, LLC v. United States*, 989 F.3d 1008, 1016 (Fed. Cir. 2021) (emphases added; citation and quotation marks omitted). *See also Major League Baseball Players Ass'n v. Chisena*, Opp'n No. 91240180, 2023 WL 2986321, *18 (T.T.A.B. Apr. 12, 2023) ("'[t]rademarks can serve to identify and distinguish a "*secondary source*" in the sense of indicating *sponsorship or authorization*. The "secondary source" is the *trademark owner and licensor* who has permitted the use of its mark on certain goods or services,'" quoting J. Thomas McCarthy, 3 *McCarthy on Trademarks and Unfair Competition*, § 3:8 (5th ed.) (emphases added)); *id.* at *19 ("'it has been held that trademarks can serve to identify and distinguish a "secondary source" in the sense of indicating sponsorship or authorization by a recognized entity. For example, the mark of a university on clothing *can signify that the university endorses and licenses the sale of such* [] *apparel by the manufacturer*,'" quoting 3 *McCarthy on Trademarks and Unfair Competition*, § 24.03(4)(a) (3d ed.) (emphasis added; additional citation and quotation marks omitted)).

I will refer, collectively, to manufacturing and to the various types of authorizations as "Product Sponsorship," and will refer to NFL merchandise of which the NFL, and/or an NFL team, is a Product Sponsor as "NFL-Sponsored," and to the corresponding sponsorship as an "NFL Sponsorship." Likewise, when I refer to the NFL in the Product Sponsorship context, such reference includes the NFL and the relevant team.

There is no doubt that some purchasers of NFL merchandise, and perhaps most, are aware that the NFL is a Product Sponsor of that merchandise. Therefore, it is reasonably possible that the NFL Marks are famous as source identifiers. However, regardless of the role of NFL Marks as source identifiers, whether famously for purposes of dilution, or generally for purposes of infringement, they nevertheless could be, and, in fact, are, functional.

The considerations that determine whether a trademark is functional depend upon the type of functionality at issue, *i.e.*, "traditional 'utilitarian' functionality or 'aesthetic' functionality," *Christian Louboutin*, 696 F.3d at 217 (citation and quotation marks omitted). First, "a product feature is considered to be 'functional' in the *utilitarian* sense if it is (1) '*essential* to the use or purpose of the article,' *or* if it (2) 'affects the cost or quality of the article'[;] . . . [and, a] feature is

Jeffrey Pash                                                                                          re: John Doe
November 1, 2024
–page 5–

*essential* if [it] is *dictated by the functions to be performed by the article*," *id.* at 219, quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850, n.10 (1982) (emphases added; additional citations and quotation marks omitted) (the quotations from *Inwood Labs.* are also quoted in *TrafFix Devices*, 532 U.S. at 32, and *Qualitex*, 514 U.S. at 165); put simply: "utilitarian functionality . . . is based on how well the product works[.] . . . [It] relates to the performance of the product in its intended purpose." *Blumenthal Distributing, Inc. v. Herman Miller, Inc.*, 963 F.3d 859, 865 (9th Cir. 2020) (citation and quotation marks omitted).

Second, "aesthetic functionality . . . is based on how good the product looks. . . . [It] is based on intrinsic aesthetic appeal." *Id.* (citation and quotation marks omitted). However, whereas a finding of utilitarian functionality precludes the "need to proceed further to consider if there is a *competitive necessity* for the [utilitarian] feature," *TrafFix Devices*, 532 U.S. at 33 (emphasis added), *i.e.*, the need to consider if "the 'exclusive use of . . . [the] functional feature . . . would put competitors at a *significant non-reputation-related disadvantage*,'" *id.* at 32, quoting *Qualitex*, 514 U.S. at 165 (emphasis added), "[i]t *is* proper to inquire into a 'significant non-reputation-related disadvantage' in cases of *[a]esthetic* functionality, the question involved in *Qualitex*," *id.* (emphases added), as the "'ultimate test of aesthetic functionality ... is whether the recognition of trademark rights would *significantly hinder competition*.'" *Christian Louboutin*, 696 F.3d at 221, quoting *Qualitex*, 514 U.S. at 170, in turn quoting *Restatement (Third) of Unfair Competition*, § 17, Comment c, p.176 (1993) (emphasis added; additional quotation marks omitted).

As *Christian Louboutin* further explained, "when the aesthetic design of a product is *itself* [(emphasis in original)] the mark for which protection is sought, we may also deem the mark functional if giving the markholder the right to use it exclusively 'would put competitors at a *significant non-reputation-related disadvantage*,'" *Christian Louboutin*, 696 F.3d at 219-220, quoting *Qualitex*, 514 U.S. at 165 (emphasis added); *see also id.* at 220 ("when evaluating design trademarks [(*i.e.*, 'trademark[s] . . . [constituting] a particular visual design, often a logo,' *Bechler v. MVP Group Int'l, Inc.*, No. 16-cv-8837, 2021 WL 848024, *6 (S.D.N.Y. Mar. 5, 2021) (footnote omitted))][,] we consider whether certain features of the design are *essential to effective competition in the particular market*" (emphasis added; citation and quotation marks omitted; cleaned up)); *id.* ("if the design feature is not 'functional' from a *traditional* perspective, it must still pass the fact-intensive *Qualitex* test and be shown *not to have a significant effect on competition in order to receive trademark protection*" (emphases added)); *id.* at 221 ("Lanham Act protection does not extend to configurations of *ornamental features*" (emphasis added), *i.e.*, features that "'do[] not serve a [utilitarian] purpose' in the design of a product," *id.* at 214, n.4, quoting *TrafFix Devices*, 532 U.S. at 35, where such protection "would *significantly* [(emphasis in original)] limit the range of competitive designs available[;] [a]ccordingly, . . . the doctrine of aesthetic functionality bars protection of a mark that is *necessary to compete in the relevant market*" (emphasis added; citations and quotation marks omitted; cleaned up)); *id.* at 222 ("[i]n short, a mark is aesthetically functional, and therefore *ineligible for protection under the Lanham Act*, where protection of the mark *significantly undermines competitors' ability to compete in the relevant market*" (emphases added)); *id.* ("[b]ecause aesthetic function and branding success can sometimes be difficult to distinguish, the aesthetic[-]functionality analysis is highly fact-specific. In conducting this inquiry, courts must

Jeffrey Pash                                                        re: John Doe
November 1, 2024
–page 6–

consider both the markholder's right to enjoy the benefits of its effort to distinguish its product and the public's right to the vigorously competitive market protected by the Lanham Act, *which an overly broad trademark might hinder*" (emphasis added; citation and quotation marks omitted)); *id.* at 223-224 ("the functionality defense does not guarantee a competitor the *greatest range* for [his] creative outlet, but only *the ability to fairly compete within a given market*. It is a first principle of trademark law that an owner may not use the mark as a means of excluding competitors from a ... market" (emphases added; citation, quotation marks, and footnote omitted)).

In sum, a trademark or trademarked feature is aesthetically functional where: (i) it is aesthetically functional in the dictionary sense, *i.e.*, aesthetically appealing; *and* (ii) the inability of a competitor to utilize it would put the competitor at a significant non-reputation-related disadvantage.

The "reputation" in "non-reputation-related disadvantage" is not the reputation of a markholder *per se*, such as the reputation of an NFL team as a football team (*e.g.*, as a good team, a popular team, etc.). Instead, the "reputation" is of a markholder in the context of "*source identification*," *Qualitex*, 514 U.S. at 165 (emphasis added) (made clear by the fact that the Court, immediately after using the phrase "significant non-reputation-related disadvantage," *id.*, contrasted a product feature's "play[ing] [of] an important role . . . in making a product more desirable" with the feature's role in "source identification," *id.*); that is, the "reputation" is that of a markholder as a *Product Sponsor. See also Jack Daniel's*, *supra*, 599 U.S. at 146 ("the *producer* of a quality product may derive significant value from its marks. They ensure that the *producer* itself—and not some 'imitating competitor'—will reap the financial rewards associated with the product's *good reputation*," quoting *Qualitex*, 514 U.S. at 164 (emphases added)); *TrafFix Devices*, 532 U.S. at 34 ("[f]ederal trademark law 'has no necessary relation to invention or discovery,' but rather, by preventing competitors from copying 'a *source-identifying mark*,' 'reduce[s] the customer's costs of shopping and making purchasing decisions,' and 'helps assure a *producer* that it (and not an imitating competitor) will reap the financial, *reputation-related* rewards associated with a desirable product,'" quoting *Qualitex*, 514 U.S. at 163–164 (emphases added)); *Matal v. Tam*, 582 U.S. 218, 225 (2017) ("[n]ational protection of trademarks is desirable . . . because trademarks foster competition and the maintenance of quality by securing to the *producer* the benefits of *good reputation*" (emphases added; citation and quotation marks omitted)); *Sulzer Mixpac AG v. A&N Trading Co.*, 988 F.3d 174, 191 (2d Cir. 2021) ("'[t]he *functionality doctrine* prevents trademark law, which seeks to promote competition by protecting a firm's *reputation*, from instead inhibiting legitimate competition by allowing a *producer* to control a useful product feature,'" quoting *Qualitex*, 514 U.S. at 164 (emphases added)); *Bubble Genius LLC v. Smith*, 239 F. Supp. 3d 586, 597 (E.D.N.Y. 2017) ("protecting [the] plaintiff's claimed trade dress would hinder competition for periodic[-]table[-]inspired novelty soaps; competitors in [the] market . . . for [such] soaps would be placed at a '*significant non-reputation-related disadvantage*' if [the] plaintiff had *exclusive rights to produce and sell* [those] soaps," quoting *TrafFix Devices*, 532 U.S. at 32 (emphases added)).

Under the principles recited above, Mr. Doe would be entitled to sell unlicensed NFL merchandise, regardless of a likelihood of confusion, if the NFL Trademarks are, with respect to NFL merchandise: (i) functional in the utilitarian sense; or (ii) aesthetically functional because (a) they are

Jeffrey Pash                                                                                          re: John Doe
November 1, 2024
–page 7–

aesthetically appealing, and (b) their absence on Mr. Doe's merchandise would put him at a significant disadvantage in the relevant market, *i.e.*, NFL fans, if that disadvantage were based on something other than his inability to represent his products as NFL-Sponsored.

In *NFL Properties LLC* ("*NFLP*") *v. The Partnerships, et al.*, No. 1:21-cv-05522 (N.D. Ill.), a trademark-infringement-and-dilution case, the NFLP alleged:

> Hundreds of millions of fans have attended NFL games and related events, enjoyed television and radio broadcasts of NFL games and related events, and purchased merchandise bearing NFL Trademarks *to identify with their favorite Member Clubs*. Millions visit <nflshop.com>, the official NFL Internet web store, as well as the official websites of the individual Member Clubs, which prominently display, and in many cases are accessed by domain names containing, NFL Trademarks.

*NFLP* Compl. (Dkt. No. 1, Oct. 18, 2021), ¶ 8 (emphasis added). The NFLP further alleged:

> As a result of the extensive use of NFL Trademarks, not only in connection with the NFL's well-known football games and related events, but also in connection with a wide variety of licensed merchandise promoted, sold and/or rendered in the United States and abroad, as well as widespread use in connection with a broad array of sponsorship activities spanning diverse industries, the NFL Trademarks have for many decades, and long prior to any use made by Defendants, functioned *as unique identifiers and synonyms in the public mind for NFLP, the NFL, and the Member Clubs*. As a result, NFL Trademarks are famous and possess significant goodwill of great value to NFLP, the NFL, and the Member Clubs.

*Id.*, ¶ 12 (emphasis added).

Paragraph "8" states the primary reason why NFL fans buy NFL merchandise: "to identify with their favorite Member Clubs"; and, of course, this identification is not in the source-identification, *i.e.*, Product Sponsorship, sense, but, rather, in the sense of identification of an NFL team, or "Member Club," *per se*, and, likewise, in the sense of identification of the NFL as a football league *per se*. It is primarily in *this* sense that NFL Marks "function[] as unique identifiers and synonyms in the public mind for . . . *the NFL[] and the Member Clubs*." *Id.*, ¶ 12 (emphasis added). Thus, insofar as NFL Marks also "function[] as unique identifiers and synonyms" of "the NFL[] and the Member Clubs" as *Product Sponsors*, this functioning is secondary in terms of purchasers' knowledge of that Product Sponsorship *and* in terms of the *importance* that purchasers ascribe to it (I omitted the paragraph "12" reference to the NFLP because I doubt that many purchasers are aware of it).

Jeffrey Pash                                                                                  re: John Doe
November 1, 2024
–page 8–

The use of NFL Marks as *per se* identifiers on NFL merchandise is "dictated by the function[]
to be performed by [that merchandise]," *Christian Louboutin*, 696 F.3d at 219 (citation and quotation
marks omitted), *i.e.*, the *primary* function of that merchandise, which, again, is to enable fans "to
identify with their favorite Member Clubs." Therefore, the NFL Marks are "essential to the use or
purpose of [that merchandise]," *id.* (citation and quotation marks omitted), and, as such, are
functional in the utilitarian sense. The saliency of this type of functionality is emphasized by the fact
that, regardless of what a fan thinks of the *aesthetic* appeal of his favorite team's trademarks
compared to the trademarks of other teams, he will have to choose merchandise containing the former
in order "to identify with [his] favorite Member Club[]." Of course, the NFL Marks are not
'utilitarian' in the traditional sense of the word, *i.e.*, they do not bear on the physical capabilities or
quality of the merchandise, such as by making an item more comfortable or durable than would the
same item with a different color scheme or a non-NFL logo. However, the NFL Marks are utilitarian
in a broader sense.

The NFL Marks are also aesthetically functional because, in order for an item of merchandise
to enable a fan "to identify with [his] favorite Member Club[]," the aesthetics of the merchandise must
be correct, *i.e.*, the item must *look* like it refers to "[his] favorite Member Club[]"; and, of course, that
Member Club's trademarks fulfill this requirement.

Some fans, of course, purchase NFL merchandise of *non*-favorite teams primarily because of
the aesthetic appeal of that merchandise or because they have positive feelings for the team; and, of
course, some do so for both reasons, although it would almost always be important to the 'aesthetic
appeal' purchasers that the merchandise enables them to identify with a well-known football team,
as opposed, for example, to a high-school team. There are also people who would not think of
themselves as a fan of any team, or even of the NFL in general, but purchase NFL merchandise for
the same reasons that 'real' fans do, with the difference being that, to the extent that such purchases
are based on the identity of the team, the purchaser's feelings would typically not be as strong as those
of a 'real' fan; a New Yorker, for example, might buy Jet *and* Giant merchandise, but not many
'real' Jet and Giant fans would do so.

To the extent that purchasers desire that their NFL merchandise is NFL-Sponsored, that
desire would almost always be in the context of preferring such merchandise to NFL Merchandise
that is *not* NFL-Sponsored; but, it would remain that the *primary* reasons for purchasing NFL
merchandise altogether are those discussed above. Thus, if all Jet merchandise lacked NFL
Sponsorship, for example, very few Jet fans would, for that reason, decline to purchase that
merchandise and instead purchase NFL-Sponsored Giant merchandise.

If NFL Marks are functional in the utilitarian sense, there would be "no need to proceed
further to consider if there is a competitive necessity for the [use of those Marks]." *TrafFix Devices*,
532 U.S. at 33. However, if the NFL Marks are instead, *and only*, aesthetically functional, the
question of competitive necessity would be presented, in which event it would be easily answered in
the affirmative, because the inability of Mr. Doe to sell NFL merchandise would undoubtedly put him
at a significant disadvantage in the relevant market, *i.e.*, NFL fans; and, this disadvantage, rather than

Jeffrey Pash                                                                                re: John Doe
November 1, 2024
–page 9–

being based on his inability to represent his products as NFL-Sponsored, would be based on his inability to reasonably compete for the business of NFL fans by enabling them to purchase NFL merchandise for the reasons that, as discussed above, underlie virtually all such purchases. Although one could, with sufficient creativity, sell merchandise that, without bearing any NFL Trademarks, would enable fans "to identify with their favorite Member Clubs," such a seller would be conducting his business with a weight on his side of the scale of competition; that is, a weight that would be so heavy as to, at best, leave him marginally competitive if he were fortunate enough to survive in the first place.

In *Bd. of Supervisors v. Smack Apparel Co.*, 550 F.3d 465 (5th Cir. 2008), in which the plaintiffs were several universities and their licensing agent, *see id.* at 471-472, the court maintained its "long-settled view rejecting recognition of aesthetic functionality," *id.* at 488, explaining:

> In *Boston* [*Professional*] *Hockey* [*Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004 (5th Cir. 1975) ("*Boston Hockey*")], we held that *emblems of a hockey team sold on embroidered patches* had no demonstrated value *other than their significance as the trademarks of the team*. Relying on our decision in *Boston Hockey*, the district court here similarly held that the [u]niversities' color schemes, logos, and designs also had *no significance other than to identify with the [u]niversities* and were *therefore nonfunctional*. We agree. Fans and other members of the public purchase [the defendant]'s shirts *only because the shirts contain the plaintiffs' colors and indicia identifying the [u]niversities' football teams*, just as people purchased the defendant's emblems in *Boston Hockey* only because they *contained the hockey team's trademarks*. In other words, the presence of the plaintiffs' marks *serve[s] no function unrelated to trademark*.

*Id.* at 486 (emphases added; footnotes omitted). The court further explained:

> [The defendant] urges . . . that the [u]niversities' colors on the t-shirts serve several functional purposes. It contends that the shirts allow groups of people to bond and show support for a philosophy or goal; facilitate the expression of loyalty to the school and a determination of the loyalties of others; and *identify the wearer as a fan and indicate the team the fan is supporting*. These claimed functional uses are *nothing more than the kind of aesthetic uses at issue in Boston Hockey*. Our circuit has *consistently rejected the concept of aesthetic functionality*.

*Id.* at 486-487 (emphases added; footnote omitted). According to *Boston Hockey*, "the embroidered symbols are sold *not because of any . . . aesthetic characteristic*," *Boston Hockey*, 510 F.2d at 1013

(emphases added), *i.e.*, not because of their "attractiveness and eye-appeal," *id.* (citation and quotation marks omitted), "but because they are the *trademarks of the hockey teams*," *id.*, whereas: "[t]hose cases which involved *utilitarian* articles . . . all involved products which had a consumer demand *regardless of their source or origin*. The principles involved in those cases are *not applicable to a trademark[-]symbol case where the design or symbol has no demonstrated value other than its significance as the trademark of a hockey team.*" *Id.* (emphases added).

   *Boston Hockey* also explained that the teams that brought the case (*i.e.*, the Bruins and 12 other National Hockey League teams, *see id.* at 1008): "[had] *acquainted the public with their marks and thereby created a demand for those marks*. Through extensive use, [the] plaintiffs have acquired a *property right in their marks* which *extends to the reproduction and sale of those marks as embroidered patches for wearing apparel. What [the] plaintiffs have acquired by use, the substantive law of trademarks as it is embodied in the Lanham Act will protect against infringement.* There is *no overriding policy of free competition* which would remove [the] plaintiffs, under the facts of this case, from the protective ambits of the Lanham Act." *Id.* at 1014 (emphases added).

   In sum, the bases of the *Boston Hockey* line's rejection of the doctrine of aesthetic functionality are: first, ascribing, to *association* with a markholder *per se*, the same significance as *source identification*, *i.e.*, identification of a markholder as a Product Sponsor, and thereupon finding that the use of a trademark to create such an association is a trademark-only, and hence, non-functional use; and, second, the notion that it is simply unfair of a markholder's competitors to free-ride on the reputation of the markholder *per se* and the value that he has imparted to his mark.

   Although the Fifth Circuit later backtracked from the property-right element of *Boston Hockey* by noting that "[o]ur cases . . . reject any notion that a trademark is an owner's 'property' to be protected irrespective of its role in the operation of our markets," *Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.*, 676 F.2d 1079, 1085 (5th Cir. 1982) (citation and quotation marks omitted), *Smack Apparel* has left, in place, the Fifth Circuit's 'association' rationale and consequent rejection of the doctrine of aesthetic functionality. However, as set forth above, that the doctrine is well recognized by the Supreme Court and the Second Circuit Court of Appeals, the latter of which noted, in *Christian Louboutin*, that, "[d]espite its apparent counterintuitiveness (how can the purely aesthetic be deemed functional, one might ask?), our [c]ourt has long accepted the doctrine of aesthetic functionality," *Christian Louboutin*, 696 F.3d at 220-221; *see also id.* at 221, n.17:

>        The doctrine of aesthetic functionality remains controversial in our
>        sister circuits, which have applied the doctrine in varying ways (and
>        some not at all). For example, the Seventh Circuit has applied the
>        doctrine of aesthetic functionality liberally, holding that "*[f]ashion is
>        a form of function*." *See Jay Franco & Sons, Inc. v. Franek*, 615 F.3d
>        855, 860 (7th Cir.2010). The Sixth Circuit recently discussed the
>        doctrine, but made clear that it has not yet decided whether or not to
>        adopt it. *See Maker's Mark Distillery, Inc. v. Diageo N. America,*

*Inc.*, 679 F.3d 410, 417-19 (6th Cir.2012). The Ninth Circuit has applied the doctrine inconsistently. *See* 1 McCarthy on Trademarks § 7:80 (4th ed.) (collecting cases). *The Fifth Circuit rejects the doctrine of aesthetic functionality entirely.* [] *Smack Apparel* [], 550 F.3d [at] 487-88 [] (arguing that the Supreme Court has recognized the aesthetic functionality doctrine only in *dicta*, and that therefore the Fifth Circuit's long-standing rejection of the doctrine was not abrogated by *Qualitex*[,] [*supra*][,] and *TrafFix* [*Devices*]).

(emphases added). I agree that the *Qualitex* Court's recognition of aesthetic functionality was *dicta*, as the type of functionality at issue was utilitarian, not aesthetic. First, the Court noted that, "it is important to use *some* color on [dry-cleaning-]press pads to avoid noticeable stains," *Qualitex*, 514 U.S. at 166 (emphasis in original), which is a utilitarian function.

Second, *Qualitex*, in using the phrase "significant non-reputation-related disadvantage," did so in the context of addressing utilitarian functionality. *See id.* at 165 ("[t]his Court consequently has explained that, '[i]n general terms, a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a *significant non-reputation-related disadvantage*," quoting *Inwood Labs.*, *supra*, 456 U.S. at 850, n.10 (emphasis added)) (nevertheless, as discussed at p.5, *supra*, *TrafFix Devices* held, in effect, that the existence of a significant non-reputation-related disadvantage is an irrebutable presumption in the utilitarian-functionality context). In any event, *TrafFix Devices* did not view the *Qualitex* Court's discussion of aesthetic functionality as *dicta*, and neither has the Second Circuit. Moreover, that doctrine is merited in its own right, as both utilitarian and aesthetic features contribute to the benefits of a product, and there is no reason why competition should be promoted only with respect to the former.

In *Au-Tomotive Gold, Inc. v. Volkswagen of Americca, Inc.*, 457 F.3d 1062 (9th Cir. 2006), the court observed that, "[t]aken to its limits, . . . [the] doctrine [of aesthetic functionality] would permit a competitor to trade on any mark simply because there is *some* 'aesthetic' value to the mark that consumers desire," *id.* at 1064 (emphasis added), and noted that, in *Vuitton et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769 (9th Cir. 1981), the court had "emphatically rejected the notion that 'any feature of a product which contributes to the consumer appeal and saleability of the product is, *as a matter of law*, a functional element of that product,'" *Au-Tomotive Gold*, 457 F.3d at 1069, quoting *Vuitton*, 644 F.2d at 773 (emphasis added), such that, "'a trademark which identifies the source of goods and *incidentally serv[es] another function* may still be entitled to protection.'" *Id.*, quoting *Vuitton*, 644 F.2d at 775 (emphasis added). The NFL Trademarks, of course, do not merely have *some*, or *incidental*, non-source-identifying functionality (whether utilitarian or aesthetic); rather, the NFL Marks are *central* to such functionality, *i.e.*, to fans' ability "to identify with their favorite Member Clubs."

*Au-Tomotive Gold* also explained that, "the *mere fact* that the mark is the '*benefit* that the consumer wishes to purchase' will not override trademark protection if the mark is source-

Jeffrey Pash                                                                                          re: John Doe
November 1, 2024
–page 12–

identifying," *Au-Tomotive Gold*, 457 F.3d at 1069, quoting *Vuitton*, 644 F.2d at 774 (emphases added); but, as made clear in *Vuitton*, which concerned aesthetic functionality, *see Vuitton*, 644 F.2d at 771, 774-775, the "benefit" was not *Boston Hockey* 'association,' but, rather, genuine source identification. That is, *Vuitton* explained that, "[f]unctional features of a product are features which constitute the *actual benefit* that the consumer wishes to purchase, *as distinguished from* an assurance that *a particular entity made, sponsored, or endorsed* a product," *Vuitton*, 644 F.2d at 774 (emphases added; citation and quotation marks omitted); *see also id.* at 776 ("[i]f the Vuitton mark increases consumer appeal only because of the *quality associated with Vuitton goods*, or because of the prestige associated with owning a *genuine Vuitton product*, then the design is serving the legitimate function of a trademark; it is *identifying the source of the product*, and thus should be protected. [¶] [T]he only *legally relevant* function of a trademark is to *impart information as to the source or sponsorship of the product*" (emphases added)); *id.* (noting, with approval, the Ninth Circuit's rejection of the Fifth Circuit's 'association' rationale, *i.e.*, rejection of the rationale that "protection should also be extended to [a] trademark's commercially more important function of embodying consumer good will created through extensive, skillful, and costly advertising," *id.* (citation and quotation marks omitted), such rejection having been explained by the Ninth Circuit's observation that "[t]he courts ... have generally confined legal protection to the trademark's source[-]identification function for reasons grounded in public policy favoring a free, competitive economy." *Id.* (citation and quotation marks omitted)).

Although *Au-Tomotive Gold* stated that, "[w]ith *Vuitton*, [the doctrine of] aesthetic functionality was dealt a limiting but not fatal blow[,] [as] the case was remanded for trial," *Au-Tomotive Gold*, 457 F.3d at 1069, citing *Vuitton*, 644 F.2d at 776, *Vuitton*, as shown above, addressed that doctrine in accordance with traditional trademark principles.

*Au-Tomotive Gold* also found that, "[e]xtending the functionality doctrine, which aims to protect 'useful' product features, to *encompass unique logos and insignia* is not an easy transition," *Au-Tomotive Gold*, 457 F.3d at 1067 (emphasis added), explaining: "[f]amous trademarks have assumed an exalted status of their own in today's consumer culture that cannot neatly be reduced to the historic function of trademark to designate source. Consumers sometimes buy products bearing marks such as the Nike Swoosh, the Playboy bunny ears, the Mercedes tri-point star, the Ferrari stallion, and countless *sports franchise logos*, for the *appeal of the mark itself*, *without regard to whether it signifies the origin or sponsorship of the product*." *Id.* (emphases added). The essential purpose of a trademark, of course, is to "signif[y] the origin or sponsorship of the product," *i.e.*, to signify Product Sponsorship; and, as set forth above, the extent to which a mark serves a purpose (whether utilitarian or aesthetic) "without regard to whether it signifies" Product Sponsorship is the extent to which it is functional (provided that, in the case of aesthetic functionality, the competition element is satisfied). The typical purchase of apparel that, per the court's examples, bears a Playboy, Mercedes, or Ferrari emblem is surely made in order for the purchaser to express his positive feelings about the product (or service) that the emblem represents, as is the case (and, if anything, more strongly so) with respect to merchandise that bears an NFL Mark. By contrast, the Nike Swoosh, per the court's example, might be aesthetically appealing without regard to the fact that the product bearing it was made by Nike, but it remains that, *primarily*, the Swoosh is viewed with respect to the

Jeffrey Pash                                                                    re: John Doe
November 1, 2024
–page 13–

latter.

    *Au-Tomotive Gold* further found that, "[i]n practice, aesthetic functionality has been limited to product features that serve an aesthetic purpose *wholly independent of any source-identifying function*," *Au-Tomotive Gold*, 457 F.3d at 1073 (emphasis added), citing: *Qualitex*, 514 U.S. at 166, as finding that "coloring dry cleaning pads served [a] nontrademark purpose by avoiding visible stains," *id.*; *Publications Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 342 (7th Cir. 1998), as finding that "coloring edges of cookbook pages served [a] nontrademark purpose by avoiding color 'bleeding' between pages"), *id.*; *Brunswick Corp. v. British Seagull Ltd.*, 35 F.3d 1527, 1532 (Fed. Cir. 1994), as finding that "[the] color black served [a] nontrademark purpose by reducing the apparent size of [an] outboard boat engine," *id.*; and, *Pagliero v. Wallace China Co.*, 198 F.2d 339, 343 (9th Cir. 1952), as finding that "[the] china patterns at issue were attractive and served [a] nontrademark purpose because 'one of the essential selling features of hotel china, if, indeed, not the primary, is the design.'" *Id. Au-Tomotive Gold* was therefore expressing agreement with the 'association' rationale of *Boston Hockey*, which *Au-Tomotive Gold* described as "holding that reproductions of [a] professional hockey franchise's logo sold alone are not 'functional' and can be protected." *Id.* at 1068.

    The court further expressed its agreement with the 'association' rationale, explaining:

> It is difficult to extrapolate from cases involving a *true aesthetically functional feature*, like a box shape or certain uses of color, *to cases involving well-known registered logos and company names*, which generally have *no function apart from their association with the trademark holder*. The present case illustrates the point well, as the use of [the plaintiffs'] marks [on key chains and license-plate covers, *see id.* at 1064] is *neither aesthetic nor independent of source identification*. That is to say, there is no evidence that consumers buy Auto Gold's products solely *because of their "intrinsic" aesthetic appeal*. Instead, the alleged aesthetic function is *indistinguishable from and tied to the mark's source-identifying nature*.

> By Auto Gold's strident admission, consumers want *"Audi" and "Volkswagen"* accessories, not *beautiful* accessories. This consumer demand is *difficult to quarantine from the source[-]identification and reputation-enhancing value of the trademarks themselves.* . . . The demand for Auto Gold's products is *inextricably tied to the trademarks themselves.* . . . Any disadvantage Auto Gold claims in not being able to sell Volkswagen or Audi marked goods is *tied to the reputation and association with Volkswagen and Audi*.

*Id.* at 1073-1074 (emphases added). The court concluded that, "Volkswagen and Audi's trademarks undoubtedly increase the marketability of Auto Gold's products[,] [b]ut their entire significance lies

Jeffrey Pash                                                                                          re: John Doe
November 1, 2024
–page 14–

in the demand for goods bearing those non-functional marks." *Id.* at 1074 (citation and quotation marks omitted).

In *LTTB LLC v. Redbubble, Inc.*, 840 F. Appx. 148 (9th Cir. 2021), the court distinguished *Au-Tomotive Gold* and perhaps suggested a retreat from the latter's 'association' rationale. As to the distinguishing, *LTTB* stated:

> In *Au-Tomotive Gold*, where the defendant admitted that consumers wanted the goods because they identified the sources (Volkswagen and Audi), "the alleged aesthetic function [was] indistinguishable from and tied to the mark's *source-identifying nature*." *Au-Tomotive Gold*, 457 F.3d at 1074. *By contrast*, there is no evidence here that consumers buy LTTB's goods *because they identify LTTB as the source*, rather than because of the aesthetic function of the phrase, "LETTUCE TURNIP THE BEET." . . .

> Although LTTB's evidence may indicate that its goods are popular, it does not indicate that consumers buy the goods *because the marks identify LTTB as the source of the goods*. In *Vuitton*, the plaintiff presented an *affidavit* by a buyer of goods for a department store stating that it was unlikely "there is anyone who would purchase a Vuitton product solely because they found the characteristic Vuitton trademark to be *aesthetically pleasing*," but instead "it is *because the design associates the products with Vuitton*." *Vuitton*, 644 F.2d at 776.

*Id.* at 150, 151 (emphases added). In *Vuitton*, the reference to the affidavit was made in the context of the court's discussion of genuine source identification. *See Vuitton*, 644 F.2d at 776. Accordingly, it appears that *LTTB* was likewise referring to genuine source identification rather than to *Boston Hockey* 'association.' To be sure, this is not perfectly clear, as the court also quoted from *Au-Tomotive Gold*'s embrace of the 'association' rationale. *See LTTB*, 840 F. Appx. at 151 ("LTTB has presented no evidence to avoid the conclusion that the marks here '*serve an aesthetic purpose wholly independent of any source-identifying function*' and thus are aesthetically functional,'" quoting *Au-Tomotive Gold*, 457 F.3d at 1073 (emphasis added)).

In *Plasticolor Molded Products v. Ford Motor Co.*, 713 F. Supp. 1329 (C.D. Calif. 1989), *vacated by consent judgment*, 767 F. Supp. 1036 (C.D. Calif. 1991), the court observed that, "[o]nly relatively recently have trademarks begun to leap out of their role as *source-identifiers* and, in certain instances, have effectively become *goods in their own right*," *id.* at 1332 (emphases added), and explained, by way of an example that concerns the 'association' rationale, that, "[w]hen sports fans wear jackets *bearing the names of their favorite teams* . . ., they are using registered trademarks and service marks, but *not to identify the source of the product*." *Id.* at 1332-1333 (emphases added) (*N.B.*: "[a] service mark is a trademark that is used in connection with services," *Restatement (Third)*

*of Unfair Competition*, § 9 (Am. Law Inst. 1993); *see also* 15 U.S.C. § 1127 (defining "trademark" and "service mark")); *Patsy's Italian Restaurant, Inc. v. Banas*, 658 F.3d 254, 259, n.1 (2d Cir. 2011) ("trademarks and service marks are generally protected by the same standards," citing 15 U.S.C. § 1053); *Savannah College of Art and Design, Inc. v. Sportswear, Inc.*, 872 F.3d 1256, 1261, n.3 (11th Cir. 2017) ("[s]ervice marks and trademarks are governed by identical standards" (citations and quotation marks omitted))).

    With respect to the "leap[ing] out of [trademarks'] role as source-identifiers and . . . effectively becom[ing] goods in their own right," *Plasticolor*, 713 F. Supp. at 1332, the court further observed: "[t]he wearer of a baseball jacket reading New York Mets does not care whether the New York Mets *manufactured* the jacket, or *authorized its production*, or are *in any way associated with it*. He wears it *to announce his allegiance* [(*i.e.*, 'to identify with [his] favorite Member Club[]')]. New York Mets may well be a service mark, but in this context *it has become a product as well*; it is a *functional component of the jacket as surely as the material from which the jacket is made*." *Id.* at 1333 (emphases added; footnote omitted). Accordingly, "[a] small but growing number of cases has recognized this change, and has found no difficulty in applying the source-identifying/functional distinction where trademarks or service marks serve purely as functional features." *Id.* (citing cases). Furthermore, the court noted: "[t]hese cases have presented no difficulty for the traditional categories of trademark law because, *as in the New York Mets hypothetical*, it has been clear that the ordinary purchaser has *treated the marks as functional items, not as source-identifiers*. This is because the mark and the product have represented radically different industries." *Id.* (emphases added). As for NFL Marks, they primarily represent the NFL and its teams *per se*, whereas NFL merchandise represents the industry to which it belongs, such as the apparel industry. The court further observed that, "reasonable purchasers could not believe *or care* that the mark holder would be competing in the same market as the product manufacturer," *id.* (emphasis added), "the same market" being, with respect to the NFL, the market of which given NFL merchandise is a part, such as the apparel market. By contrast, "[w]here the mark and the product come from the same or similar industries, however, the distinction between the categories blurs, because a mark can serve simultaneously as a source-identifier and a functional element," *id.*, as might have been the case, for example, if the United States Football League had had a team that used NFL Trademarks.

    Given the NFL's history of licensing NFL Marks to merchandise manufacturers, those Marks, with respect to NFL merchandise, *do*, to some, and perhaps most, NFL fans, "serve simultaneously as a source-identifier and a functional element," such that those fans "could easily interpret the [M]arks both ways simultaneously," *id.* at 1335 (as discussed at pp.4, 7-8, *supra*), even though the NFL and its licensees do not "come from the same or similar industries." *Id.* at 1333. This dual, or mixed, use of NFL Marks raises "three alternatives," *id.* at 1337: "[f]irst, . . . that the source-identifying aspects of the feature trump the functional aspects, and simply [are governed by] the standard law of trademark infringement[;] [s]econd, . . . the opposite, [*i.e.*,] that the feature is unprotected from copying[;] [and] [t]hird, . . . an appropriate middle ground." *Id.* The first alternative was "adopted in a case very similar to [*Plasticolor*]." *Id.* That is, "in *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.*, 532 F.Supp. 651 (W.D.Wash.1982), the defendant, without authorization from the plaintiff, manufactured *replicas of professional football*

Jeffrey Pash                                                                                              re: John Doe
November 1, 2024
–page 16–

jerseys," *id.* (emphasis added), and: "[t]he court found that the jerseys' design, colors and use of team
names *created a likelihood of confusion as to sponsorship*. The court then discussed, without
deciding, whether the jersey attributes were functional features, and concluded: '*Even assuming the
marks are functional*, this assumption does not, however, preclude trademark protection. A
functional feature *may additionally serve as a trademark and be protected as such*.'" *Id.*, quoting
*Wichita Falls*, 532 F. Supp. at 662 (emphases added; additional citation omitted; cleaned up).
However, the *Plasticolor* court disagreed with this rationale:

> We are unable to adopt this reasoning. Affording the same
> degree of protection against *mixed-use* copying as against *purely
> source-identifying* copying has the effect of *protecting functional
> features*, a result *clearly contrary to established trademark law*. If we
> apply straightforward trademark law, we would enjoin the production
> of articles likely to cause public confusion as to source or sponsorship
> both at and after the point of sale. Confusion *after* the point of sale,
> however, is *inherent in a partial functional use*: A mixed-use article
> that eliminates the likelihood of confusion after the point of sale also
> defeats much of the feature's functionality. Consider some examples:
> *A football jersey bearing the words "Seattle Seahawks (Not Affiliated
> with the Seattle Seahawks)"*; *a shoulder patch reading "Boston
> Bruins (Not Sponsored by the Boston Professional Hockey
> Association)"*; a floor mat reading "Ford (Not Manufactured by Ford
> Motor Company)." These disclaimers *would probably end confusion
> as to source*, but would also *effectively negate the functional aspects
> of the marks*. Treating *mixed uses* exactly like *source-identifying uses*
> would thus protect *functional features* [from being copied], a result
> *contrary to established principles of trademark law. See* p. 1336
> *supra. The reasoning of* [*Wichita Falls*] *flies in the face of this
> authority.*

*Id.* (emphases added; footnote omitted).

*Plasticolor* also rejected the second of the three alternatives quoted above, explaining: "[the]
treat[ment] [of] *mixed* uses as *entirely functional* uses, and accordingly [the] withhold[ing] [of] all
protection[,] . . . . has been implicitly adopted in the Third and Sixth Circuits. [citing cases] Again,
we decline to follow, this time because to do so would contravene the clear language of the Lanham
Act." *Id.* at 1338, citing 15 U.S.C. § 1114(1) (emphasis added). Upon noting that "[t]he Ninth Circuit
has twice posited the existence of the situation we confront today, and has twice suggested that there
may be a middle ground between pure functionality and pure source-identification," *id.*, thus
"indicating that mixed uses are entitled to some protection . . . . [without] suggest[ing] that mixed
uses are to be afforded full trademark protection," *id.* at 1339, the court found that the appropriate
resolution regarding mixed-use trademarks was the third alternative, *i.e.*, "a solution that permits
trademarks to be copied as functional features, but minimizes the likelihood that the public will

Jeffrey Pash                                                                                   re: John Doe
November 1, 2024
–page 17–

associate the copied mark with the [markholder]." *Id.*

As to "the point of sale," *id.*, the court found that "[t]here need be no conflict . . . ., [because] [t]he functional use of a trademark does not preclude a clear indication at the point of sale (in the form of a label, packaging, or other identification easily removed or concealed by the consumer) that the product is not manufactured or sponsored by the [markholder]," *id.*, but: "after the point of sale[,] the likelihood[-]of[-]confusion standard must be tempered . . . . [because] requiring the manufacturer to eliminate the likelihood of confusion past the point of sale will, in most cases, entirely eliminate the possibility that the mark could serve a functional purpose. A floor mat whose upper surface reads 'FORD (not authorized by Ford Motor Company)' would obviously attract few customers." *Id.* Thus, the court found that, "[p]rotecting functional copying of trademarks will therefore require that we tolerate at least some confusion as to source or sponsorship after the point of sale. . . . [,] [although] [t]he possibility of post-sale confusion can be eliminated entirely if the [markholder] is able to embody its trademark in a copyrighted logo." *Id.* & n.17. The court further explained:

> The potential for confusion can be diminished, however, by requiring that the manufacturer of a product that employs a trademark for functional purposes take all reasonable steps to eliminate post-sale confusion consistent with the functional use of the mark. The manufacturer will, for example, often be able to place a disclaimer on a portion of the article not generally visible while the article is in use. A notice of non-authorization on the underside of a [car's] floor mat, or *a disclaimer affixed to the inside of a football jersey*, will not hinder the functional use of a trademark, but may somewhat reduce the likelihood of post-sale confusion. In other cases, the copier may be able to *place its own name alongside the copied trademark without interfering with the mark's functionality*. There may also be cases where a visible disclaimer will not detract from the functional purpose of the trademark. Whatever the method chosen, it must be *the most effective reasonably available that does not materially interfere with the trademark's functional purpose*.

*Id.* (emphases added). Regardless of whatever appeal this rationale might have, it is now settled that one who copies functional features is not required take affirmative measures to avoid the likelihood of confusion. *See* p.2, *supra* (quotations from *Ezaki Glico Kabushiki Kaisha*, *supra*, and *Christian Louboutin*, *supra*). The same was clearly implied in *TrafFix Devices*, *supra*, which happened to concern a utilitarian product feature, *i.e.*, "[a] dual-spring design[] to keep . . . . [t]emporary road signs . . . . upright despite adverse wind conditions," *TrafFix Devices*, 532 U.S. at 25, "the dual-spring design [being] the essential feature of the [plaintiff's] trade dress," which comprised "[a] sign stand[] incorporating . . . [that] design." *Id.* The Sixth Circuit Court of Appeals, which *TrafFix Devices* reversed, had required the defendant to "avoid emulating the trade dress," *Marketing Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 940 (6th Cir. 1999), such as by using "a *hidden* dual-spring mechanism or a *tri*[-] or *quad*-spring mechanism," *id.* (emphases added), in order "to set

Jeffrey Pash                                                                                              re: John Doe
November 1, 2024
–page 18–

its [sign stand] apart to avoid infringing [on] the . . . trade dress," *id.* at 940 (emphases added), as, otherwise, the defendant's sign stand "could confuse the public." *Id.*

On appeal, the Supreme Court ruled that, "[b]ecause the dual-spring design is functional, it is unnecessary for competitors to explore designs to hide the springs, say, by using a box or framework to cover them, as suggested by the Court of Appeals." *TrafFix Devices*, 532 U.S. at 34. The Court then explained: "[t]he dual-spring design assures the user [that] the device will work. If buyers are assured [that] the product serves its purpose by seeing the operative mechanism[,] that in itself serves an important market need. It would be at cross-purposes to those objectives, and something of a paradox, were we to require the manufacturer to conceal the very item [that] the user seeks." *Id.* The Court, given its review, and rejection, of the Sixth Circuit's reasoning, surely recognized that the defendant, by copying the plaintiff's dual-spring design and making it publicly visible, "could confuse the public," *TrafFix Devices, Inc.*, 200 F.3d at 940; indeed, the Court had also noted that, "the dual-spring design . . . *inform[s] consumers* that the sign stands are *made by [the plaintiff]* . . . . [,] [but is also] *[f]unctional*[.]" *TrafFix Devices*, 532 U.S. at 33 (emphases added). The Court further made clear that a likelihood of confusion was tolerable, by noting that, "[t]he Lanham Act . . . does not protect trade dress in a functional design simply because an investment has been made to encourage the public to *associate a particular functional feature with a single manufacturer or seller*." *Id.* at 34-35 (emphasis added).

The toleration of a likelihood of confusion in the utilitarian-functionality context is clearly applicable in the aesthetic-functionality context as well, as nothing about the differences between these two types of functionality would call for such toleration in the one context but the avoidance of it in the other. Of course, no competitor may go beyond copying functional features in order to pass off his product as that of another, such as if the defendant in *TrafFix Devices* were to have affixed the plaintiff's customary trademark to the defendant's sign stands, or if Mr. Doe were to represent, on a label, that his merchandise is NFL-Sponsored.

In *Pennsylvania State University v. Vintage Brand, LLC*, 614 F. Supp. 3d 101 (M.D. Pa. 2022) ("*Penn State I*"), the court addressed the question that *Boston Hockey*, in effect, answered in the affirmative: "[u]nder the Lanham Act, does a symbol *identify the source of the goods* if it *merely creates an association between it and the trademark holder*?" *Id.* at 103 (emphases added). *See also id.* at 106, 107 ("should trademark holders—particularly those in the business of education, research, and New Year's Six [football bowl games]—have an exclusive right to control merchandise bearing their marks[,] . . . . [¶] [where] *the mark itself is the product*[,] . . . . [¶] [and] when consumers are purchasing the products *not for their guaranteed quality*, but to *signal their support for or affiliation with the trademark holder*?" (emphases added)). The court initally noted:

> Entities' efforts to control the use of their marks on merchandise beginning in the 1970s represented yet another attempt to expand the protections provided to sellers under the law. For universities, this trademark use diverged from traditional areas of trademark protection, such as Penn State preventing an unaffiliated

educational institution from using its name. In this hypothetical, a consumer might reasonably believe that they are enrolling in a Penn State affiliate. But university-trademarked apparel and merchandise present a different case; *the mark itself is the product*.

From the outset[,] views diverged on whether, given this *overriding non-trademark function*, the marks still identified the entity as *the source or sponsor of the goods*. Some, notably . . . *Boston* [] *Hockey* and the [United States Patent and Trademark Office's] Trademark Trial and Appeals Board in *In re Olin Corp.*, [181 U.S.P.Q. 182, 1973 WL 19761 (T.T.A.B. 1973)][,] found that the marks inherently do. The Fifth Circuit drew this conclusion from the fact that consumers only purchase the merchandise because of the *mental association it creates between the trademark and trademark holder*. The question as [*Boston Hockey*] saw it was answered by sole reference to *whichever party's toil generated the sale*, with *no need to undertake a fact-intensive inquiry into whether consumers believed the trademark holder had manufactured or sponsored the product*. The Trademark Trial and Appeals Board, on the other hand, reasoned from the negative. It found that a mark—like that of New York University's—"inherently.... advise[s] the purchaser [that] the university is the secondary source of that shirt" because "[i]t is not imaginable that Columbia University will be the source of an N.Y.U. T-Shirt." This per se approach (as I'll call it) is forwarded by Penn State here; and, if adopted, it would entitle the University to its motion to dismiss as there can be no doubt that Vintage Brand's customers are buying its Penn State products *because of the associations they create with the University*.

*Id.* at 107-108 (emphases added; footnotes omitted). The court added, however: "*still more have rejected* this per se approach—even if they ultimately found that a bona fide mark had been infringed Instead, as these courts have emphasized, trademark law requires *more than a mental association between the trademark and trademark holder*. As they see it, the consumer *must instead believe that the trademark indicates that the trademark holder is the source, sponsor, or is otherwise affiliated with the good—a question of fact*," *id.* at 108 (emphases added; footnote omitted), although "many courts have still not squarely addressed the question. And that list includes the Supreme Court and the United States Court of Appeals for the Third Circuit." *Id.*

*Penn State I* then addressed "*Champion Products v. University of Pittsburgh*[,] [which] migrated back and forth between the Western District of Pennsylvania and the Third Circuit." *Id.* First: "the district court . . . reject[ed] the *Boston Hockey* approach. It found that there was no likelihood of confusion as to the good's source, origin, authorization, or sponsorship; that the marks served the *solely functional purpose of 'allow[ing] the consumer to show his [] allegiance to Pitt*';

Jeffrey Pash                                                                                            re: John Doe
November 1, 2024
–page 20–

and[,] finally[,] that apparel with Pitt's mark did not *primarily* serve a *secondary purpose of 'identify[ing] the source of the product rather than the product itself.'* [*Inwood Labs.*, 456 U.S. at 851, n.11][.]" *Id.* at 110-111, quoting *University of Pittsburgh v. Champion Prods. Inc.*, 566 F. Supp. 711, 721 (W.D. Pa. 1983), *order vacated* (3d Cir. Feb. 2, 1984) (due to "a consent decree that was included in the parties' settlement agreement," *id.* at 111 (emphases added; footnote omitted)).

> *Penn State I* also criticized the reasoning of the Trademark Trial and Appeals Board:

> > I find the analysis offered by the Trademark Trial and Appeals Board in its eligibility cases unconvincing. In the university context, these revolve around *In re Olin Corp.*[,] [181 U.S.P.Q. 182, 1973 WL 19761 (T.T.A.B. 1973)][.] There, in explaining why a New York University-branded shirt would identify the university as the sponsor or authorizer, the Board reasoned, "[i]t is not imaginable that Columbia University will be the source of an N.Y.U. T-shirt." [*In re Olin Corp.*, 1973 WL 19761 at *1] But this play on an intercollegiate rivalry distracts from an error in reasoning: *you cannot determine whether consumers believe an entity is the source or secondary source of a good by crossing out one entity that consumers obviously believe is not*. The conclusion that purchasers will think that N.Y.U. sponsored or authorized the shirt *does not necessarily follow from the statement that no purchaser will think that Columbia University is the source*. There's a *gulf of other possibilities*.

*Penn State I*, 614 F. Supp. 3d at 111 (emphases added). Likewise, the fact that one would not expect the Cowboys (or Major League Baseball) to sponsor Steeler merchandise does not leave the Steelers, or the NFL, as the only conceivable sponsors of that merchandise; in the same vein, it would be unlikely for Candidate Smith, or his political party, to be the source of an advertisement supporting his opponent, Candidate Jones, but there could, of course, be various sources for such an advertisement other than Candidate Jones or his political party. Accordingly: "[t]he [c]ourt . . . [saw] no reason to perpetuate or resuscitate this per se approach. Whether consumers believe that a university is the source, sponsor, or authorizer of merchandise bearing its marks should—minimally—turn on just that: what the consumers believe. And for that reason, Penn State's motion to dismiss . . . . [¶] Vintage Brand's . . . . counterclaim, [which] contends that three of the University's marks should be canceled because they are ornamental and fail to function as trademarks[,] . . . . [¶] . . . . is denied." *Id.* at 103, 111-112.

> Finally, *Penn State I* reasoned: "[t]he circularity is apparent: the law only offers protection if there's belief . . . . [that a] product can bear the name of an entertainer, cartoon character, or some other famous person [only if] permission is given for its use . . . . , yet the belief comes from consumers' *(mis)conception about the law*. It would seem perverse to award market exclusivity based on a *fake-it-until-you-make-it approach*. If consumers' confusion stems from their *incorrect belief* that goods bearing Penn State's emblem *must be licensed*, shouldn't that belief be corrected, not

Jeffrey Pash                                                                                  re: John Doe
November 1, 2024
–page 21–

perpetuated?" *Id.* at 114 (emphases added).

As did *Plasticolor* with respect to that court's New York Mets example, *University of Pittsburgh*, *supra*, found that, "[t]he Pitt insignia, as used by Champion [to be] prominently emblazoned on soft goods, are functional," *Univ. of Pitt.*, 566 F. Supp. at 716, because: "[t]hese insignia perform the function of *allowing the wearer to express identity, affiliation, or allegiance to Pitt*[;] [t]his functional feature is an *essential feature* of the product[;] [and][,] [t]he product *could not perform this function unless it bore the Pitt insignia*." *Id.* (emphases added). Accordingly, the court found that, "[t]he Pitt insignia prominently emblazoned on the Champion Pitt-insignia soft goods is *therefore essential to the use or purpose of the articles*," *id.* (emphasis added), and added: "'with negligible exception, a consumer does not desire a "Champion" T-shirt, he . . . desires a "Pitt" T-shirt. The entire impetus for the sale is the consumer's desire to *identify with Pitt* or, perhaps more realistically, *with Pitt's athletic programs.*'" *Id.*, quoting *University of Pittsburgh v. Champion Products Inc.*, 686 F.2d 1040, 1047 (3d Cir. 1982) (emphases added). Just as *Univ. of Pitt.* found that the Pitt insignia was functional under the criteria that determine utilitarian functionality (although, to be sure, the doctrine of aesthetic functionality had not yet been developed), the NFL Trademarks on NFL merchandise are functional in the utilitarian sense (as discussed at p.8, *supra*).

*Univ. of Pitt.* also expressed its disagreement with, the 'association' rationale of *Boston Hockey*:

> We have considerable sympathy for the . . . University of Pittsburgh. The notion that a university's name and insignia are its own property, to do with as it chooses, has *a certain common-sense appeal*. An examination of the law and the facts in this case has convinced us, however, that neither Congress, nor the Pennsylvania Legislature, nor the common law has created the property right that Pitt asserts here. We believe that were we to rule in favor of Pitt, we would be creating a *new substantive right in an area of the law in which Congress and the states have legislated extensively*. The relief sought by Pitt is *not minor*; it amounts to a *judicially created, perpetual monopoly on a product, Pitt-insignia soft goods, which many people wish to purchase*.

*Id.* at 712 (emphases added).

In *Pennsylvania State University v. Vintage Brand, LLC*, 715 F. Supp. 3d 602 (M.D. Pa. 2024) ("*Penn State II*"), "Penn State University . . . challenge[d] Vintage Brand's use of . . . . historical sports images . . . . on the goods that it produces, as many of those images incorporate[d] in some form one or more of Penn State's trademarks," *id.* at 613, even though "the images [were] visually distinct from those trademarks," *id.*, and even though "Vintage Brand provide[d] numerous disclaimers on its website that disavow[ed] affiliation with any university." *Id.* The court held that, "[t]hese facts mean that many of Penn State's claims fail[,] [but] the existence of dueling facts

Jeffrey Pash                                                                    re: John Doe
November 1, 2024
–page 22–

regarding likelihood of confusion mean[s] that Vintage Brand's trademark[-]infringement claim must proceed to trial." *Id.* The likelihood-of-confusion issue would have been moot *if* the court had ruled that, as a matter of law, Penn State's marks were functional, but, instead, the court found that, "it *cannot be said, as a matter of law*, that Penn State's exclusive use and control of its marks would put Vintage Brand at a *significant non-reputation related disadvantage*," *id.* at 647 (emphases added), explaining:

> It is not necessary for Vintage Brand to use the specific Penn State Marks to compete in the athletics[-]apparel marketplace or even the Penn State[-]apparel marketplace. For example, Vintage Brand could use *non-trademarked Penn State historical images* that omit the Penn State Marks. Or Vintage Brand could use *its own creative language* to attempt to entice Penn State supporters to purchase its goods. Vintage Brand could even seek to use *non-protected color schemes* to invoke Penn State in the minds of consumers without infringing upon any trademark. For instance, many alumni and supporters or Syracuse University or Bucknell University would undoubtedly associate a bright orange and navy blue necktie with their favored [sic] university—and likely purchase such goods—even if that tie *lacked any marks that explicitly associated it with those universities.*

*Id.* at 647-648 (emphases added). *See also id.* at 647, n.308 ("[f]or example, companies are prohibited from using the term 'Super Bowl' without authorization; many creative companies skirt this prohibition by using terms such as 'the Big Game'—a reference that any fan of the National Football League instantly recognizes."). However, the court ruled: "[a]lthough prohibiting Vintage Brand from using the Penn State Marks would *undoubtedly place Vintage Brand at a disadvantage* in trying to win over Penn State supporters, the evidence is *simply insufficient at this stage* to describe that disadvantage as *significant*. Consequently, there remains a genuine issue of material fact as to *whether the marks are aesthetically functional*, and [Vintage Brand's request for] summary judgment on that ground [(*see id.* at 638)] will be denied." *Id.* at 648 (emphases added) (according to PACER, "[j]ury [s]election [is] scheduled for 11/12/2024").

It would be unrealistic to expect that the ability to sell the types of non-trademark-bearing merchandise that the court suggested as possibly enabling Vintage Band to be sufficiently competitive would enable Mr. Doe to be sufficiently competitive in appealing to NFL fans. Of course, *some* fans would be happy to purchase merchandise that enables them "to identify with their favorite Member Clubs" without the help of NFL Marks, but it is beyond doubt that if Mr. Doe were limited to selling such merchandise, he would be "at a significant non-reputation related disadvantage," as discussed at pp.8-9, *supra* (as to the court's 'Super Bowl vs. the Big Game' example, it might well suffice, for instance, for a restaurant to advertise its showing of "the Big Game," but few NFL fans wishing to purchase merchandise relating to the NFL finale would give nearly as much (let alone equal) consideration to merchandise referring to "the Big Game" as they would to that which refers to the

Jeffrey Pash                                                                        re: John Doe
November 1, 2024
–page 23–

"Super Bowl.").

      *Penn State II* concluded:

>     As a final note, the [c]ourt cannot ignore the *practical impact* of any ruling that finds [that] a university's marks are aesthetically functional because consumers wear goods bearing those marks only to express support for the institution itself. This would *essentially render those marks wholly unprotectable*, even if use of the marks would lead to *confusion regarding the source or sponsorship of the product*. Such a conclusion would stray dangerously close to the polar opposite of the per se approach rejected by this [c]ourt [in *Penn State I*, *i.e.*, "the per se approach utilized by the Trademark Trial and Appeal Board [], wherein the use of a university's marks will always identify that university as a sponsor of the physical goods," *id.* at 641) (footnote omitted)], and would mean that no trademark for universities would ever be valid for tangible goods. That is a conclusion that the [c]ourt cannot adopt.

*Id.* at 648 (emphases added). However, as set forth herein, a trademark is, regardless of a likelihood of confusion, free to be copied in a particular context if such copying is functional in either the utilitarian or aesthetic sense; and, in the merchandise context, NFL Trademarks are clearly functional in each of those senses.

      Please contact me on or before November 18, 2024, to discuss the possibility of forging an agreement between NFLP and Mr. Doe that would enable him to sell NFL merchandise without fear of litigation.

Sincerely,

[s/ Todd C. Bank]

Todd C. Bank

# EXHIBIT "B"

**Letter from NFL Properties LLC to Todd C. Bank**

**November 18, 2024**



NATIONAL FOOTBALL LEAGUE

November 18, 2024

**VIA EMAIL**
Todd C. Bank, Attorney At Law, P.C.
119-40 Union Turnpike
Fourth Floor
Kew Gardens, NY  11415
tbank@toddbanklaw.com

**Re: Proposed Unauthorized Use of NFL Marks**

Dear Mr. Bank:

I write on behalf of NFL Properties LLC ("NFLP") in response to your November 1, 2024, to Jeff Pash on behalf of your unidentified "John Doe" client. As you know, NFLP is the authorized representative of the National Football League ("NFL") and its thirty-two member clubs ("Member Clubs") for the licensing and protection of the names, logos, color combinations, uniform trade dress, slogans and other identifying marks and indicia of the NFL and its Member Clubs.

In your letter, you explain that your client "wishes to sell unlicensed NFL merchandise" bearing "NFL Marks."[1]  You argue that "Mr. Doe's sale of unlicensed NFL merchandise would not constitute either trademark infringement or dilution" because such use of NFL Marks would be "'functional' with the meaning of trademark law…."  Nevertheless, you also seek to "discuss the possibility of forging an agreement between NFLP and Mr. Doe that would enable him to sell NFL merchandise without fear of litigation."

Your assertion that the unauthorized use of NFL Marks on merchandise is permissible as functional, and thus does not require a license from NFLP or the relevant Member Club, is incorrect. The NFL Marks are well-known source indicators that do not have any non-trademark function, and use of those marks on products connotes affiliation with or endorsement by the NFL and/or its Member Clubs. Indeed, this is reflected in several of the cases cited in your letter (as well as others). *See, e.g., Savannah College of Art & Design, Inc. v. Sportswear, Inc.*, 872 F.3d 1256 (11th Cir. 2017); *Bd. of Supervisors v. Smack Apparel Co.,* 550 F.3d 465 (5th Cir. 2008); *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062 (9th Cir. 2006); *Nat'l Football League Props., Inc. v. Wichita Falls Sportswear, Inc.*, 532 F. Supp. 651 (W.D. Wash. 1982).

If your client engages in the unauthorized use of NFL Marks, or any marks confusingly similar thereto, such use will constitute trademark infringement, dilution, and/or unfair competition, and also

---

[1] In your letter, "NFL Marks" are defined as (1) "an NFL team's color patterns and overall design except for an NFL, or NFL team's, logo or insignia, *i.e.,* a trademark in the form of a trade dress" and (2) "trademark[s] in the form of an NFL, or NFL team's, logo or insignia, *i.e.*, a 'customary' trademark."  Solely for the purposes of responding to your correspondence, this letter uses the same definition of NFL Marks.

Todd C. Bank, Attorney At Law, P.C.
November 18, 2024
Page 2

will misappropriate the goodwill and reputation of the NFL and/or its Member Clubs. *See, e.g., Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.,* 188 F.3d 427 (7th Cir. 1999); *Indianapolis Colts, Inc. v. Met. Baltimore Football Club Ltd. P'ship,* 34 F.3d 410 (7th Cir. 1994); *Dallas Cowboys Football Club, Ltd. v. America's Team Props., Inc.*, 616 F. Supp. 2d 622 (N.D. Tex. 2009); *Nat'l Football League Props.,* 532 F. Supp. 651. NFLP reserves the right to take appropriate action to protect the intellectual property rights of NFL and its Member Clubs, including by contacting your client's web host company and any other online accounts (including social media accounts) requesting that any infringing uses of NFL Marks be removed. Furthermore, having fully informed you of our rights, NFLP will treat any unauthorized use of the NFL Marks by your client as intentional and willful, which would entitle NFLP to enhanced damages and reimbursement of its attorneys' fees.

If your client is interested in being considered for a license from NFLP, information about that process may be found at https://businessapps.nfl.net/NFLConsProd/Welcome/CpPrequalify.htm.

Nothing in this letter shall be construed as a waiver or relinquishment of any rights or remedies of the NFL, NFLP or its Member Clubs, all of which are expressly reserved.

Sincerely,

Bonnie L. Jarrett
Senior Counsel
Email: Bonnie.Jarrett@NFL.com